IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


TAX MATRIX TECHNOLOGIES, LLC,    :    CIVIL ACTION
    :    No. 13-6223
        Plaintiff,    :
    :
    v.    :
    :
WEGMANS FOOD MARKETS, INC.,    :
    :
        Defendant.    :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.            January 7, 2016

I.    FACTUAL BACKGROUND.......................................... 3

    A.    The Letter Agreement.................................. 3

    B.    Prior Dealings Between the Parties................... 8

    C.    The Maryland Audit.................................... 9

    D.    Tax Matrix Rewrites Standard Agreement.............. 18

    E.    Tax Matrix's Invoice and the Parties' Discussions
        Concerning Alternative Fee Arrangements............. 19

II.    PROCEDURAL HISTORY......................................... 22

III. STANDARD OF REVIEW........................................ 25

IV.    TAX MATRIX's BREACH of CONTRACT CLAIM.................... 27

    A.    Tax Matrix's Motion for Summary Judgment as to its
        Breach of Contract Claim........................... 33

        1.    Plain Meaning of the Contingency Fee
            Provision...................................... 33

            a.  The "Shall Mean" Clause in the Definition of
               "Refund(s)" ................................ 34

            b.  The "Shall Include" Clause in the Definition
               of "Refund(s)" ............................. 36

        2.    Extrinsic Evidence............................ 45

    B.    Wegmans' Motion for Summary Judgment as to Tax
        Matrix's Breach of Contract Claim.................. 51

V.   WEGMANS' FIRST AND SECOND COUNTERCLAIMS CONCERNING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AND BREACH OF FIDUCIARY DUTY................................ 57

   A.   Wegmans' First Counterclaim Concerning Tax Matrix's Breach of the Implied Covenant of Good Faith and Fair Dealing............................................. 60

   B.   Wegmans' Second Counterclaim Concerning Tax Matrix's Breach of Fiduciary Duty........................... 62

VI.  WEGMANS' THIRD COUNTERCLAIM CONCERNING TAX MATRIX'S BREACH OF CONFIDENTIALITY........................................ 67

VII. CONCLUSION............................................. 69

This dispute arises out of a business relationship between Tax Matrix Technologies, LLC ("Plaintiff" or "Tax Matrix"), a tax consulting firm, and Wegmans Food Markets, Inc. ("Defendant" or "Wegmans"), a regional supermarket chain. Pursuant to a written contingency fee arrangement (the "Letter Agreement"), Tax Matrix was to provide certain tax consulting services to Wegmans. This case concerns Tax Matrix's defense of Wegmans during an audit by the State of Maryland that commenced in October 2011 and closed in July 2013 (the "Maryland audit"). Although the facts of the case appear complicated, when reduced to their essence, they are generally not disputed. The parties agree that one, they entered into the Letter Agreement; two, Wegmans engaged Tax Matrix in connection with the Maryland audit; three, Tax Matrix did work on the Maryland audit; and four, Tax Matrix achieved good results for Wegmans on that audit. What the parties disagree about is whether the work performed by Tax Matrix during the Maryland audit falls within

the scope of work contemplated by the Letter Agreement, whether some other implicit fee arrangement based on the parties' past practices inter se or course of conduct applies, or regardless, whether Tax Matrix merits payment under the doctrine of unjust enrichment.

Tax Matrix brings state law claims against Wegmans for breach of contract or, in the alternative, unjust enrichment. Wegmans, in exchange, has filed counterclaims against Tax Matrix for breach of an implied covenant of good faith and fair dealing, breach of fiduciary duty, and breach of contract. Each party has now moved for summary judgment.

For the reasons that follow, the Court concludes that the Letter Agreement is fairly susceptible to different reasonable interpretations as to whether it governs Tax Matrix's services in connection with the Maryland audit. Accordingly, the Court will: (1) deny summary judgment to Tax Matrix on Tax Matrix's breach of contract claim; (2) deny summary judgment to Wegmans on Tax Matrix's breach of contract claim; and (3) grant summary judgment in favor of Tax Matrix on all of Wegmans' counterclaims.

I.    **FACTUAL BACKGROUND**

   A.    <u>The Letter Agreement</u>

Plaintiff Tax Matrix is a Pennsylvania corporation that specializes in sales and use tax consulting and offers a

3

variety of services, including audit defense, overpayment review, and tax research. Compl. ¶ 1. Defendant Wegmans is a New York corporation that operates a regional chain of largescale food markets. Id. ¶ 2.

Tax Matrix and Wegmans have had a consultant-client relationship for several years. Pl.'s Mot. Summ. J. Ex. 2, Chuck Henderson Dep. at 18:5-6, ECF No. 42. For most of the parties' relationship, Chuck Henderson, the Assistant Director of Tax at Wegmans, was Tax Matrix's primary contact until his retirement in January 2013. Answer ¶ 9, ECF No. 4; Henderson Dep. at 11:5-7. At the outset of the parties' business relationship, Tax Matrix performed only "point of sale related" work for Wegmans. Henderson Dep. at 18:9-12. After some time, however, Wegmans sought to engage Tax Matrix for "audit defense" work. Id. at 18:13-22.

On May 15, 2009, Tax Matrix sent Wegmans a two-page letter (the "Letter Agreement") concerning audit-related services to be performed by Tax Matrix for Wegmans. See Pl.'s Mot. Summ. J. Ex. 1. The Letter Agreement was signed and accepted by Wegmans on May 21, 2009. Id.

The Letter Agreement is a standard form contract created and regularly used by Tax Matrix with its other clients. Knapp Dec. Ex. A, Feathers Dep. at 22:24-23:6, ECF No. 43. Wegmans and Tax Matrix agreed to the standard terms, with the

exception of the percentage of the contingency fee, as discussed below. Id. at 23:7-23:12; Henderson Dep. at 16:5-16.

Under the Letter Agreement, Tax Matrix would "examine Client records relating to sales and use taxes for the Tax Periods and, where applicable, apply for Refund(s) and/or assessment reductions for the Client." Pl.'s Mot. Summ. J. Ex. 1. With respect to the specific services that Tax Matrix would provide, the Letter Agreement states as follows:

In connection with these services, Tax Matrix will:

  1. Review the pertinent Client records for overpayment. In order to quantify and substantiate the Refund claims, Tax Matrix will examine the following for the Tax Periods:

     • Accounts Payable files

     • Chart of Accounts and Cost Center listing

     • Monthly General Ledger for Sales and Use Tax liability accounts

     • Other pertinent records and/or documents that may provide supporting documentation for the petition for Refund;

  2. As may be mutually agreed upon, prepare, file, and process the relevant petition for Refund; and

  3. As may be mutually agreed upon, secure the Refund from the applicable State authority and/or vendors.

Id.

The Letter Agreement includes definitions for two terms used in the scope of services provision, "Tax Period(s)" and "Refund(s)":

> "Tax Period(s)" shall mean any tax period for which the statute of limitations period, including waiver period, has not expired as of the date of acceptance of this contract. Tax Matrix's services for additional Tax Periods may be extended at the option of the Client.
>
> "Refund(s)" shall mean all amounts recovered through the refund claim process and shall include Refund(s) and/or reductions of sales and uses taxes paid, assessment reductions, interest (or imputed interest, if applicable), and amounts which are credited against another tax liability of the Client.

Id.

The Letter Agreement further provides that "[i]n consideration for performance of the aforementioned services," Tax Matrix would receive "twenty five percent (25%) of all refunds." Pl.'s Mot. Summ. J. Ex. 1. Tax Matrix initially proposed a contingency fee of thirty-three percent of all refunds, but Mr. Henderson successfully negotiated that down to twenty-five percent. Henderson Dep. at 16:11-16. As stated in the Letter Agreement, the parties "understood and agreed that the aforementioned services rendered by Tax Matrix are on a contingent fee basis and, if no Refund amounts are recovered, the Client shall not be indebted to Tax Matrix for any fees or costs whatsoever." Pl.'s Mot. Summ. J. Ex. 1. The two-page

6

Letter Agreement does not reference any type of fee arrangement other than the contingency fee.

Under the Letter Agreement, Wegmans could "terminate this Agreement at any time by written notice," in which case "final reports will be submitted by Tax Matrix with the findings to date of all Refunds and Refund claims in progress. Upon receipt by Client of such Refund information in the report, Client agree[d] to pay Tax Matrix as outlined above." Id.

Wegmans was to "notify Tax Matrix promptly upon its receipt of any Refund(s)" and "[a]ll amounts due to Tax Matrix as a result of this Agreement [were to] be invoiced after a Refund has been received by [Wegmans] or a credit has been applied to any obligation of [Wegmans]. All amounts due to Tax Matrix shall be due within ten (10) days of the receipt of the invoice." Id.

The Letter Agreement also contains a confidentiality clause stating that "Tax Matrix agrees that any information obtained in the course of providing its services shall be used solely for the purposes stated in this Agreement." Id. Tax Matrix "agree[d] not to disclose any information obtained for any reason other than to further the process described in the Agreement," and its "non-disclosure obligation shall remain in effect indefinitely." Id.

Finally, the Letter Agreement states that "[t]his Agreement constitutes the entire agreement between Tax Matrix and the Client. No amendment of any provision of this Agreement shall be effective unless made in writing and signed by both Tax Matrix and the Client." Id.

B.    Prior Dealings Between the Parties

The Letter Agreement governed numerous audit defense projects over the course of the parties' business relationship without incident. Pl.'s Br. in Support of Mot. Summ. J. ¶ 8, ECF No. 40. Typically, Wegmans first involved Tax Matrix after the state had already closed its audit and Wegmans was pursuing an appeal of the tax assessment. Henderson Dep. at 19:2-5. However, at some point, Wegmans decided to involve Tax Matrix earlier, while audits were still open. Henderson Dep. at 19:6-8, 19:10-13, 20:18-23.

When Tax Matrix began representing Wegmans during ongoing state audits, Tax Matrix and Wegmans did not have a separate conversation, or enter into a separate written agreement, concerning how Tax Matrix was to be compensated. Id. at 21:20-25, 22:12-16.

C.   <u>The Maryland Audit</u>

At the center of the parties' dispute in this case is a sales and use tax audit of Wegmans by the State of Maryland that commenced in October 2011 and closed in July 2013.

On or about November 11, 2011, Wegmans received notice that it was being audited by the State of Maryland. Answer ¶ 12, ECF No. 4. Shortly thereafter, Mr. Henderson asked Tax Matrix to defend Wegmans during the upcoming audit. Henderson Dep. at 31:2-4, 37:7-21, 41:5-8 ("Q: Did there come a point in time that you explicitly asked Tax Matrix to help Wegmans defend this audit? A: No question."). Specifically, Mr. Henderson sought Tax Matrix's assistance in reducing the amount of any claimed tax deficiency during the audit process before the State of Maryland issued its final assessment. <u>Id.</u> at 87:4-12.

Tax Matrix designated one of its consultants, Melissa Myers, as Wegmans' primary contact for the Maryland audit. Knapp Dec. Ex. B, Myers Dep. at 37:2-37:4. Early on, Ms. Myers had discussions with Wegmans personnel concerning "strategizing" in preparation for the Maryland auditors' first visit, and Tax Matrix's involvement became "real[ly] hands-on" shortly thereafter. <u>Id.</u> at 42:2-6.

Upon Tax Matrix's engagement for the Maryland audit, there was no separate engagement agreement--written or otherwise--between the parties in connection with the services

Tax Matrix was to provide on the audit. And there was no discussion between the parties concerning whether the Letter Agreement applied to this work or otherwise how Tax Matrix would be compensated for its services. From Mr. Henderson's perspective, Tax Matrix was already "hired to do this kind of thing" by Wegmans, and the two parties had "an ongoing relationship" with respect to "sales tax and states." Henderson Dep. at 37:10-18. It is not clear, however, whether Wegmans believed this "ongoing relationship" was rooted in the Letter Agreement or some other course of conduct between the parties. Id. 37:19-22 (Q: And is that because you already had in place the contract from 2009? A: I guess technically you could say that. Although if I didn't, I still would have asked them.").

In June 2012, two Maryland auditors, Diane Pappas and Charles Luckie, visited Wegmans' headquarters for the first time. Pl.'s Mot. for Summ. J. ¶ 15; Def.'s Mot. Summ. J. 5, ECF No. 43-1. During their first visit, the auditors were unable to complete their review of all necessary documents, including certain documents related to Wegmans' new Columbia and Crofton, Maryland stores, which were still under construction at the time. Pl.'s Mot. Summ. J. ¶ 16; Def.'s Mot. Summ. J. 5. At the end of the auditors' visit, it was unclear how close the auditors were to completing the audit and whether they planned to return to Wegmans' headquarters to review additional records.

10

Pl.'s Mot. for Summ. J. ¶ 5. However, Mr. Henderson asked Tax Matrix to continue working with the auditors. Henderson Dep. at 48:12-16.

In or around September 2012, the Maryland auditors requested an extension of the statute of limitations for the audit, which was set to expire on November 30, 2012. Id. at 51:24-52:13. Mr. Henderson agreed to the extension based on his understanding that the State could otherwise issue a jeopardy assessment. Id. at 52:12-25. The auditors then made a second visit to Wegmans' headquarters in late October 2012. Id. at 54:6-15. During this second visit, Wegmans made available construction accounting documents concerning the Columbia and Crofton stores, among other things. Id. at 54:12-17.

Several weeks later, on December 6, 2012, Ms. Myers emailed Maryland's lead auditor, Ms. Pappas, to inquire whether Maryland's workpapers--documents which would show Wegmans' tax deficiency--were finalized. See Pl.'s Mot. Summ. J. Ex. 3. Ms. Pappas replied that the workpapers had been finalized and that she had submitted the schedules to her supervisor, Danielle Douglas, for final approval. Id. On the other hand, the other Maryland auditor assigned to the audit, Mr. Luckie, claims that the audit was "[n]owhere near done" in December 2012, at least in part because the auditors had not received certain additional

11

documents concerning the Columbia and Crofton stores. Def.'s Mot. Summ. J. 5 (quoting Luckie Dep. at 17:20-18:7).

On December 12, 2012, Ms. Pappas sent Ms. Myers the first set of workpapers with the results of the audit. Pl.'s Mot. Summ. J. Ex. 7. The workpapers indicated a total sales and use tax deficiency of $4,639,411.87 and showed that Maryland intended to tax the capital assets of Wegmans' Columbia and Crofton locations in full, stating "A-5 through A-8 taxable amounts are total purchases with MD vendors as per review of the other four locations." Id.; Pappas Dep. at 31:8-32:1. Upon receipt of the workpapers on December 12, Ms. Myers phoned Mr. Henderson and explained that Maryland was taxing the capital assets of the Columbia and Crofton locations nearly in full. Henderson Dep. at 81:8-10.

The December 12 workpapers included a signature block entitled "Acknowledgement of Audit Closing Meeting" which stated that "[b]y signing below Taxpayer or Authorized Representative is acknowledging receipt of workpapers accompanied by an explanation of the audit results," and that "[t]he deficiency listed above does not represent a formal assessment" and "[a] formal assessment notice accompanied by appeal right will be mailed to the Taxpayer." Id. Mr. Henderson knew that if Wegmans signed the acknowledgment or did nothing, Maryland may have assessed that number. Henderson Dep. at 89:10-12; see also id.

12

at 105:14-20 ("Q: . . . If the state alleges that $4.6 million in tax is owed and Wegmans doesn't sign off on it and Tax Matrix does no more work, you testified earlier that then you're going to get a notice of assessment for that number; correct? A: That's correct."). Therefore, instead of signing the acknowledgement, Mr. Henderson advised Tax Matrix to "continue trying to get the auditors to realize their mistakes and reduce the numbers." Id. at 86:21-25.

After her conversation with Mr. Henderson, Ms. Myers contacted the Maryland auditors to object to the methodology used in the first workpapers in taxing the capital assets of Wegmans' Columbia and Crofton stores. Pl.'s Mot. Summ. J. Ex. 9, at 5-6; Myers Dep. at 147:16-148:14. Ultimately, the Maryland auditors changed their methodology and instead applied an error rate methodology to the Columbia and Crofton stores. Pl.'s Mot. Summ. J. Ex. 9, at 6.

On December 17, 2012, the State sent Tax Matrix revised workpapers, showing a total sales and use tax deficiency of $2,153,430.62. Pl.'s Mot. Summ. J. Ex. 13. The nearly $2.5 million difference in Wegmans' purported tax deficiency appears to be the result of the Maryland auditors' application of "developed error factor" to the capital assets of the Columbia and Crofton stores. Id. The December 17 workpapers included the same "Acknowledgment of Audit Closing Meeting" signature box as

13

the December 12 workpapers, meaning that the State of Maryland could close its audit and issue a formal assessment notice, with right to appeal, if Wegmans signed the acknowledgment.

In early January 2013, Mr. Henderson retired from Wegmans, and Laurie Phelps assumed principal responsibility for the Maryland audit and became Tax Matrix's primary contact at Wegmans. Henderson Dep. at 11:5-12:15, 92:24-25. Another individual named Corby Vicks was hired a few months later to take over some of Mr. Henderson's responsibilities, including portions of the Maryland audit. Pl.'s Mot. Summ. J. Ex. 16, Phelps Dep. at 19:12-16.

Before becoming Director of Taxation, Ms. Phelps had no contact with Tax Matrix. Id. at 18:8-11, 19:20-20:12. Shortly before his retirement, however, Mr. Henderson explained Wegmans' relationship with Tax Matrix and the parties' contingency fee arrangement to Ms. Phelps. Id. at 22:21-23:2. During her deposition, Ms. Phelps testified that she understood from Mr. Henderson that Tax Matrix would be compensated for its work on the Maryland audit "based on the agreement we had in place." Id. at 99:21-100:7.

On January 2, 2013, Tax Matrix's Jason Frownfelter emailed Ms. Phelps an update on the progress of the Maryland audit defense, specifically stating that "[a]s of last week, the auditor is assessing $1,838,491.72 on the capital side." Pl.'s

14

Mot. Summ. J. at Ex. 7. Tax Matrix continued performing this
reductive work throughout January and February 2013. Pl.'s Mot.
Summ. J. 15.

On March 15, 2013, Ms. Myers forwarded to Ms. Phelps
workpapers on February 28, 2013, showing a total sales and use
tax deficiency of $1,045,753.62 and a lower "error factor" for
the capital assets of the Columbia and Crofton stores. Pl.'s
Mot. Summ. J. Ex. 18. The workpapers included the same
"Acknowledgment of Audit Closing Meeting" signature block as the
earlier workpapers. Id. Ms. Myers forwarded the workpapers to
Ms. Phelps on March 4, 2013, explaining that the "[g]reat news
is that we have been able to successfully reduce the original
liability from $4,639,411.87 to $1,045,753.62 on the final
assessment." Pl.'s Mot. Summ. J. Ex. 23.

On March 15, 2013, Ms. Myers forwarded to Ms. Phelps
another set of revised workpapers from the State of Maryland,
which contained minor adjustments from the February 28
workpapers to correct for an error in calculations for the tax
liability on the capital side. Pl.'s Mot. Summ. J. Ex. 20. The
revised total sales and use tax deficiency was now
$1,049,998.80. Id. at Ex. 21. Again, the workpapers included an
"Acknowledgment of Audit Closing Meeting" signature box. Id.
This time, Mr. Speranza signed the acknowledgment on behalf of
Wegmans, expecting that signing might trigger Maryland to close

15

the audit and issue the final assessment. Id.; Phelps Dep. at 35:22-36:4. Even though Wegmans signed off on the revised workpapers, the State of Maryland and Tax Matrix later agreed to an additional extension of the limitations period in connection with the audit. Pl.'s Mot. Summ. J. Ex. 22.

A few months later, on June 18, 2013, Ms. Myers wrote to Ms. Phelps and Mr. Vicks, advising that the State of Maryland had issued updated workpapers showing that Wegmans' total sales and use tax deficiency was now $300,621.13. Pl.'s Mot. Summ. J. Ex. 29. With offset credits taken into account, that figure was further reduced to $255,542.92. Id. at Ex. 30. According to the "capital asset recap" included in this set of workpapers, the Maryland auditors were no longer applying any error factor to the capital assets of the Columbia and Crofton stores, thereby significantly minimizing any claimed tax deficiency in connection with those stores' assets. Id. Again, these workpapers included an "Acknowledgement of Audit Closing Meeting" signature box, which was identical to the one contained on all of the earlier workpapers. Id. Mr. Speranza again signed the Acknowledgement and forwarded it to Tax Matrix. Id.; id. at Ex. 32.

On June 20, 2013, Ms. Phelps emailed Wegmans executives with an update on the Maryland audit. Among other things, she reported:

> We are in a much better position today than we were several months ago! Initially they were proposing a $4.6 million assessment. The liability reflected on their Audit Closing Acknowledgment is now $255K. This amount represents the liability relating to direct mailings ($298K) offset by some credits. Any assessment relating to fixed assets is minimal.

Id. at Ex. 33. Similarly, on June 21, 2013, Mr. Vicks circulated an internal memorandum at Wegmans entitled "Maryland Sales & Use Tax Audit Summary of Audit Results," in which he remarked that

> [t]he proposed audit tax liability was reduced from an initial proposed assessment of $4.6 million down to $256,000. The majority of the reduction was achieved by reintroducing asset records, providing copies of missing invoice documentation, assisting the auditors by tracing and identifying self-assessed use tax accruals from monthly sales tax return workpapers and providing additional records that confirm projects to furnish and install real property.

Id. at Ex. 34.

The State of Maryland issued the Notice of Assessment for Sales and Use Tax to Wegmans on or about July 15, 2013, assessing Wegmans with a final sales and use tax deficiency of $255,542.82, plus penalty and interest--the same deficiency listed in the final workpapers. Id. at Ex. 35. At that point, the Maryland audit was finally closed.

17

D.   <u>Tax Matrix Rewrites Standard Agreement</u>

At some point by early January 2013--while Tax Matrix was still defending Wegmans during the open Maryland audit--Tax Matrix discovered that the scope of services delineated in its standard form agreement might not capture work performed by Tax Matrix while an audit was still open and before the state issued a final tax assessment to the client--exactly the type of work that Tax Matrix was then performing for Wegmans. In a January 6, 2013 internal email to Tax Matrix's President, Mike Espenshade, Tax Matrix's Tax Director, wrote: "I see a potential problem with our contract wording (not necessarily with Wegmans, but overall). For example, with the Wegmans MD audit, we technically are not reducing an actual assessment per our contract . . . just preliminary findings. Thoughts?" Knapp Dec. Ex. M at 1.

Tax Matrix subsequently rewrote its standard agreement. <u>Id.</u> Ex. L. Specifically, the new agreement provided that "Refunds shall include but not be limited to, tax refunds, tax benefits, tax credits and/or reductions to current tax payments, tax liabilities, preliminary audit assessments, or audit assessments, including interest (or imputed interest, if applicable) and/or penalty." <u>Id.</u> at 17. Tax Matrix, however, did not communicate with Wegmans concerning the potential problem with the Letter Agreement as it related to the Maryland audit.

18

E.   Tax Matrix's Invoice and the Parties' Discussions
     Concerning Alternative Fee Arrangements

On August 5, 2013, Tax Matrix sent Ms. Phelps an invoice for its services in connection with the Maryland audit. Id. at Ex. 36, 37. Pursuant to the twenty-five percent contingency fee provision contained in the Letter Agreement, Tax Matrix billed for a fee of $1,370,079.25 based on the difference between the tax deficiency amounts assessed in the first set of workpapers from December 2012 and the final Notice of Assessment issued in July 2013. Id. at Ex. 37.

Upon receipt of the invoice, Ms. Phelps, surprised by Tax Matrix's fee, reviewed the Letter Agreement for the first time. Def.'s Mot. Summ. J. 9; Phelps Dep. at 104:13-20. Ms. Phelps then phoned Mr. Espenshade, informing Tax Matrix--for the first time--that Wegmans did not consider the reductive work that Tax Matrix had performed in connection with the Maryland audit to constitute an "assessment reduction" under the Letter Agreement, because, in her view, "the only assessment that [Wegmans] received was the one for $255,000" in the July 2013 Notice of Assessment. Id. at 91:11-17, 92:2-6. Ms. Phelps believed that the term "assessment reduction" in the Letter Agreement only applied to reductions after the close of an audit and the issuance of a final assessment. Id. at 103:4-7. Therefore, although Ms. Phelps recognized that Tax Matrix

19

performed a substantial amount of work in connection with the
Maryland audit and deserved some form of compensation, see
Def.'s Mot. Summ. J. 9, she felt that "there was nothing due at
the time under the contract." Id. at 92:10-22.

Ms. Phelps and Mr. Espenshade had a number of
conversations in an effort to amicably resolve the billing
dispute, in part because the parties continued their consulting
relationship in connection with other tax matters. For instance,
on August 12, 2013, Ms. Phelps wrote the following email to Mr.
Espenshade:

> I thought it would be helpful to level set
> everything.
>
> I spoke with Chuck [Henderson] last week and he
> indicated that Tax Matrix was involved with the
> Maryland audit early in the process. Well before
> any potential workpapers were drafted. I know the
> audit spanned 4 years and 5 months and began in
> December 2011 and concluded within the past
> month.
>
> I've reread our engagement letter and reviewed
> some detail from prior fees paid for your work.
> We have been following the model laid out in the
> engagement letter by paying 25% of all refunds
> and assessment reductions. This model has been
> consistently used and was used in the prior
> assessment/refunds for our NY audit.
>
> If we apply the same process to the Maryland
> audit, our starting point is the $300,000
> identified in the audit closing meeting summary
> dated 6/17/2013. I don't think this is a fair
> starting point to calculate your fees, a fairer
> stating point is the $1,049,000 identified in
> March 2013 by the Maryland auditor.

> Once we have resolved this invoice, I'd like to
> clarify our billing arrangements. Since our
> engagement letter doesn't address managing
> audits, it may be worth considering an
> arrangement to bill time and materials for
> managing an audit. Then our current engagement
> letter would begin once an assessment is received
> with the 25% fee on actual refunds and actual
> formal assessment reductions.

Pl.'s Mot. Summ. J. Ex. 41. Then, on August 20, 2013, Ms. Phelps
emailed Mr. Espenshade under the subject line "One additional
alternative to invoice," wherein she proposed the following:
"We'll pay 25% of the savings from the reduction of the $1M
assessment plus an hourly rate from $4M to $1M due to the
unusual nature of the audit list." Id. at Ex. 42. In these
communications, Ms. Phelps never specifically explained why she
believed that the March 2013 workpapers, which reported a tax
deficiency of roughly one million dollars, were a more
appropriate starting point than the December 2012 workpapers.

During discussions concerning the invoice, Ms. Phelps
advocated that Tax Matrix should lower its success fee or
otherwise agree to cap its invoice or that payment should be
based on hourly billing for the time Tax Matrix's consultants
spent working on the audit. Def.'s Mot. Summ. J. 9; Pl.'s Mot.
Summ. J. Ex. 43. Tax Matrix stood firm in its belief that the
Letter Agreement's contingency fee applied to its work on the
Maryland audit, although it did offer a 12.5 percent "courtesy

21

discount" if Wegmans paid the invoice by a certain date. Id. at 9-10.

In early October 2013, after Ms. Phelps and Mr. Espenshade had reached an impasse, Mr. Espenshade wrote a letter to Danny Wegman, the Chairman and CEO of Wegmans, seeking payment of Tax Matrix's invoice. Id. at Ex. 43. In the letter, Mr. Espenshade outlined the terms of the Letter Agreement, Tax Matrix's work in connection with the Maryland audit, and his efforts to reach an agreement regarding the invoice with Ms. Phelps. Id. Mr. Espenshade also forwarded a copy of this letter to Mr. Henderson, as the two had remained in touch after Mr. Henderson's retirement. Pl.'s Mot. Summ. J. 24. Upon reviewing the letter, Mr. Henderson emailed Mr. Espenshade, writing, in pertinent part, "I thought [the letter] brought out all the facts as they occurred over the period of the audit. . . . Most importantly it spoke the truth." Id. at Ex. 44. Mr. Wegman never responded to the letter, and to date, Wegmans has not paid Tax Matrix in connection with its services on the Maryland audit. Pl.'s Mot. Summ. J. 2. As a result, Tax Matrix pursued the instant action.

## II.  PROCEDURAL HISTORY

On October 24, 2013, Plaintiff Tax Matrix filed its Complaint on the basis of diversity jurisdiction pursuant to 28

U.S.C. § 1332. ECF No. 1. Tax Matrix brings a claim for breach of contract based on Wegmans' failure to pay Tax Matrix's $1,370,079.25 invoice in accordance with the Letter Agreement's twenty-five percent contingency fee. Id. Tax Matrix seeks damages for the amount of the invoice--$1,370,079.25--along with interest and costs. Id. In the alternative, Tax Matrix brings a claim for unjust enrichment for the amount of the invoice plus interest and costs. Id.

On November 19, 2013, Defendant Wegmans filed its Answer and Counterclaim. ECF No. 4. Wegmans brings three counterclaims against Tax Matrix: breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and breach of contract.

In its first counterclaim, Wegmans contends that Tax Matrix breached an "implied covenant [of good faith and fair dealing] by attempting through immoral, dishonest and wrongful conduct[] to collect additional commissions to which it is not entitled" based on Tax Matrix's attempts to collect the twenty-five percent contingency fee. Id. at ¶ 23. With respect to its second counterclaim, Wegmans argues that "[a]s Wegmans['] agent and representative with respect to the Maryland audit, Tax Matrix owed Wegmans a fiduciary duty of the utmost loyalty and honesty." Id. at ¶ 27. Wegmans alleges Tax Matrix breached this duty "by engaging in dishonest and misleading acts intending to

23

collect additional commissions that it had not earned and to
which it was not entitled." Id. at ¶ 28. For both of these
counterclaims, Wegmans claims that it is entitled to recover the
costs and expenses it incurs in defending the instant action,
including attorney's fees and litigation expenses. Id. at ¶¶ 25,
30.

In its third counterclaim, Wegmans claims that Tax
Matrix breached the confidentiality provision in the Letter
Agreement when it "issued a press release containing
confidential information concerning Wegmans that it obtained
during the Maryland tax audit" without first obtaining Wegmans'
permission to do so. Id. at ¶ 33. It claims that "Tax Matrix had
no valid purpose for issuing the press release and, upon
information and belief, its sole goal in doing so was to attempt
to damage Wegmans['] reputation in order to extract additional
commissions to which it is not entitled." Id. It also breached
the confidentiality provision by filing the Complaint in the
instant action without seeking permission to file the action
under seal or otherwise attempting to redact confidential
information. Id. at ¶ 34. As a result, Wegmans claims that its
reputation has been harmed, and it has suffered damages in its
business relations. Id. at ¶ 35.

On December 9, 2013, Tax Matrix filed a Motion to
Dismiss the Counterclaim or Strike Defendant's Request for

24

Attorneys' Fees or, in the Alternative, for a More Definitive Statement, ECF No. 12, which the Court subsequently denied. ECF No. 24. At the hearing concerning the motion to dismiss, the parties focused mostly on what state law governs Wegmans' counterclaims. The parties ultimately agreed that Pennsylvania law governs the counterclaims. Tax Matrix then filed an Answer to the Counterclaim on May 23, 2014. ECF No. 28.

On November 13, 2014, Tax Matrix filed a motion for summary judgment. ECF No. 40. On December 8, 2014, Wegmans filed its own motion for summary judgment. ECF No. 43. Each party has filed its response to the other's motion, ECF Nos. 45, 46, as well as a reply, by leave of the Court, in further support of its own motion for summary judgment, ECF Nos. 53, 54. Because a Stipulated Protective order has been entered, ECF No. 22, much of the material filed in connection with the motions for summary judgment has been filed under seal.[1] The motions have been fully briefed and are now ripe for disposition.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled

---

[1]     While the parties have filed certain documents under seal pursuant to a Stipulated Protective Order, this Memorandum does not disclose any sensitive or proprietary information covered by the Stipulated Protective Order. See Stipulated Protective Order at 2 n.1, ECF No. 22.

to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

The standard for summary judgment is identical when addressing cross-motions for summary judgment. See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008). When

26

confronted with cross-motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Schlegel v. Life Ins. Co. of N. Am., 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998)).

## IV.  TAX MATRIX'S BREACH OF CONTRACT CLAIM

A federal court sitting in diversity must apply the substantive law as decided by the highest court of the state whose law governs the action. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1371 n.15 (3d Cir. 1996). Although the Letter Agreement does not contain a choice-of-law provision indicating which state's law controls, the parties do not seem to dispute that Pennsylvania law governs the interpretation and construction of the Letter Agreement.[2]

---

[2]     During the May 1, 2014 hearing on Tax Matrix's motion to dismiss Wegmans' counterclaims, the parties agreed that the counterclaims are governed by Pennsylvania law. At the time, the parties did not articulate their positions as to whether Pennsylvania law applies to Tax Matrix's breach of contract claim. However, in their summary judgment motions, the parties reference cases decided under Pennsylvania law, with one exception: Wegmans relies extensively on Big M, Inc. v. Dryden Advisory Grp., No. 08-3567, 2009 WL 1905106 (D.N.J. June 30, 2009), a case from the District of New Jersey decided under New Jersey contract law.

Under Pennsylvania law, "contract formation requires (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009) (applying Pennsylvania law). The parties do not dispute that the Letter Agreement was a valid contract. In fact, Wegmans engaged Tax Matrix pursuant to the Letter Agreement on a number of different occasions, and Wegmans paid Tax Matrix the twenty-five percent contingency fee for these services. Indeed, even after this case was filed, the parties continued to move forward with multiple projects governed by the Letter Agreement, and Wegmans paid Tax Matrix's invoice pursuant to the Letter Agreement's contingency fee on one such project. See Pl.'s Mot. Summ. J. Ex. 50, Espenshade Aff. ¶¶ 7-8, ECF No. 46. Therefore, the issue presented in this case is not whether a valid contract was formed between the parties, but whether the scope of the contract extends to the

---

While the parties have previously suggested that both Pennsylvania and New York could have interests in this matter (since Tax Matrix is headquartered in Pennsylvania and Wegmans is headquartered in New York), nothing in the record suggests that New Jersey law conflates with Pennsylvania law in relevant areas or has any relationship to this case. Since the parties otherwise argue this case under Pennsylvania law and have agreed that Pennsylvania law governs the counterclaims, the Court will analyze Tax Matrix's breach of contract claim under Pennsylvania law.

work that Tax Matrix performed in connection with the Maryland audit.

Both Tax Matrix and Wegmans move for summary judgment on Tax Matrix's breach of contract claim. To establish a claim for breach of contract under Pennsylvania law, the plaintiff must show: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract, and (3) resultant damages. McShea v. City of Phila., 995 A.2d 334, 340 (Pa. 2010). Here, it is undisputed that Wegmans has not paid Tax Matrix's invoice in connection with the Maryland audit and that Tax Matrix suffered damages in that it has not been paid for its services. Tax Matrix argues that its work on the Maryland audit clearly falls within the scope of work contemplated by the Letter Agreement and Wegmans' refusal to pay Tax Matrix for that work therefore breaches the Letter Agreement. Wegmans, however, argues that Tax Matrix's reductive work does not fall within the scope of services contemplated by the Letter Agreement, and it therefore has not breached the contract by refusing to pay the contingency fee payment. Instead, Wegmans is willing to pay Tax Matrix hourly compensation in an amount that has not yet been determined under an unjust enrichment theory.

The crux of this dispute is thus whether the terms of the Letter Agreement cover Tax Matrix's services in connection

with the Maryland audit; or if not, whether Tax Matrix performed these services pursuant to some other implicit agreement between the parties that was not reduced to writing; or if not, whether the parties never reached any sort of agreement as to Tax Matrix's services on the Maryland audit.

The first question, whether the terms of the Letter Agreement cover Tax Matrix's services in this case, presents an issue of contract interpretation. In American Eagle Outfitters v. Lyle & Scott Ltd., the Third Circuit, applying Pennsylvania law, prescribed the methodology that a court should use when interpreting a contract. 584 F.3d at 587-88. "[A]s a preliminary matter, courts must determine as a matter of law which category written contract terms fall into--clear or ambiguous." Id. at 587 (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir. 1995)). Generally, interpretation of a written agreement is a task to be performed by the court rather than a jury. Id. (citing Allegheny Int'l v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994); Gonzalez v. U.S. Steel Corp., 398 A.2d 1378, 1385 (1979)). However, "this approach--judicial interpretation of contract--only holds so long as the words of the contract are clear and unambiguous, or the extrinsic evidence is conclusive." Id. (citing Martin v. Monumental Life Ins. Co., 240 F.3d 223, 233 (3d Cir. 2001)). Where the language chosen by the parties is ambiguous, deciding

the intent of the parties becomes a question of fact for a jury.
Id. (citing Cmty. Coll. of Beaver Cty. v. Cmty. Coll. of Beaver,
375 A.2d 1267, 1275 (1977)).

When interpreting a contract, the court begins with
the "firmly settled" principle that "the intent of the parties
to a written contract is contained in the writing itself." Id.
(citing Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa.
Super. Ct. 1993)). Where the words of a contract are clear and
unambiguous, its meaning must be determined by its contents
alone, without reference to extrinsic aids or evidence. Id.
(citing Steuart v. McChesney, 444 A.3d 659, 661 (Pa. 1982)).

On the other hand, "a contract is ambiguous, and thus
presents a question of interpretation for a jury, if the
contract is reasonably susceptible of different constructions
and capable of being understood in more than one sense." Id.
(quoting Allegheny Int'l, 40 F.3d at 1425). Under such
circumstances, a court "may look outside the four corners of the
contract" and "receive extrinsic evidence . . . to resolve the
ambiguity." Id. at 588 (quoting Duquesne Light Co., 66 F.3d at
614).

In summary,

[a] contract is ambiguous if it is reasonably
susceptible of different constructions and
capable of being understood in more than one
sense. The court, as a matter of law, determines
the existence of an ambiguity and interprets the

31

> contract whereas the resolution of conflicting
> parol evidence relevant to what the parties
> intended by the ambiguous provision is for the
> trier of fact.

In re Old Summit Mfg., 523 F.3d 134, 137 (3d Cir. 2008) (quoting

Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986)).

  In its motion for summary judgment, Tax Matrix claims

that the Letter Agreement is unambiguous and clearly applies to

the kind of work it performed in connection with the Maryland

audit. Wegmans, in its cross-motion for summary judgment, also

claims that the contract is unambiguous but it argues that the

Letter Agreement clearly does not apply to the kind of work that

Tax Matrix performed on the Maryland audit. Therefore, Tax

Matrix's theory of the case is grounded on the Letter Agreement.

In contrast, Wegmans' theory of the case rejects the notion that

the Letter Agreement controls and rather points to an apparent

implicit agreement evidenced by the parties' past practices

inter se or course of conduct or alternatively suggests that the

parties never reached an agreement concerning Tax Matrix's work

on the Maryland audit. Because the Court is required to rule on

each party's summary judgment motion on an individual and

separate basis, Schlegel, 269 F. Supp. 2d at 615 n.1, the Court

will consider each motion in turn.

A.   <u>Tax Matrix's Motion for Summary Judgment as to its
     Breach of Contract Claim</u>

In its motion for summary judgment, Tax Matrix argues
that the Letter Agreement provides that Tax Matrix is to earn a
twenty-five percent contingency fee on "all refunds," and
"refunds" includes "reductions of sales and use taxes paid," as
well as "assessment reductions." Pl.'s Mot. Summ. J. 2. Tax
Matrix asks the Court to consider extrinsic evidence to reach
the conclusion that the results achieved by Tax Matrix during
the Maryland audit were either "reductions of sales and use
taxes paid" or "assessment reductions." <u>Id.</u> at 28-38.

1.   <u>Plain Meaning of the Contingency Fee Provision</u>

As <u>American Eagle Outfitters</u> instructs, the Court
begins its analysis with the plain language of the contractual
provision at issue. 584 F.3d at 587. Here, the Letter Agreement
provides that Tax Matrix is to be compensated for its services
by way of a contingency fee of "twenty-five percent (25%) of all
refunds."[3] Pl.'s Mot. Summ. J. Ex. 1. The term "[r]efund(s)" is

_____

[3]      The Court notes that in the Letter Agreement, the term
"refunds" is capitalized in some places and not capitalized in
other places. Because the parties have not set forth any
arguments in their briefs concerning the capitalization of this
term, the Court will construe these differences as inadvertent
drafting errors. The Court notes, however, that inconsistences
such as this one demonstrate that the Letter Agreement is "not a
prime example of clear drafting," <u>Am. Eagle Outfitters</u>, 584 F.3d
at 588, and further supports the conclusion that the Letter
Agreement is susceptible to different interpretations.

33

defined in the Letter Agreement as "all amounts recovered through the refund claim process" and "shall include Refund(s) and/or reductions of sales and use taxes paid, assessment reductions, interest (or imputed interest, if applicable), and amounts which are credited against another tax liability of the Client." Id. Tax Matrix argues that the "reductions" it achieved from the first workpapers issued by the State of Maryland in December 2012 constitute a "refund" under the Letter Agreement and it is therefore entitled to a twenty-five percent contingency fee. Specifically, it claims that the reductions were either "assessment reductions" or "reductions of sales and use tax paid." Pl.'s Mot. Summ. J. 28-34. Wegmans opposes both assertions.

The Letter Agreement's definition for the term "Refund(s)" is comprised of two clauses. The first clause begins with the words "shall mean," and the second clause begins with the words "shall include." The Court will consider both clauses in determining whether the term is ambiguous.

a.   The "Shall Mean" Clause in the Definition of "Refund(s)"

To begin, the Court looks to the "shall mean" clause: "Refund(s) shall mean all amounts recovered through the refund claim process." Pl.'s Mot. Summ. J. Ex. 1.

34

First, the term "all" before "amounts" indicates that the "whole amount or quantity of," "as much as possible," or "any whatever" amounts recovered should be considered a "refund," suggesting that "refunds" are to be broadly defined. Webster's Ninth New Collegiate Dictionary 70-71 (1990).

Second, the definition refers to the entire "refund claim process" and not just one particular stage of that process, such as an audit or appeal. "Process" means "a series of actions or operations conducing to an end" or "the whole course of proceedings in a legal action." Id. at 937. Thus, the term "process" could fairly be read to encompass the entire series of events that would comprise a state's audit of a taxpayer and the taxpayer's subsequent appeal, if any--not just the events that occur after the state issues a final notice of assessment and the taxpayer elects to pursue reductions on appeal.

However, in opposing summary judgment, Wegmans asks this Court to focus on a different word in the "shall mean" clause: the term "recovered." Specifically, it argues that a tax reduction must be an "amount[] recovered through the refund claim process" to constitute a "refund." Def.'s Opp. to Pl.'s Mot. Summ. J. 11 (quoting Letter Agreement). It cites Black's Law Dictionary for the proposition that the plain and ordinary meaning of the word "recover" is "[t]o get back or regain." Id.

35

(citing Black's Law Dictionary 1306 (8th ed. 2004)). Thus, it argues "[p]re-assessment 'reductions' from preliminary work papers are not amounts 'recovered,' unless the taxpayer ultimately gets money back from the State."[4] Id. Because "Wegmans did not 'get back or regain' any of the purported 'reductions' that Tax Matrix claims it caused" and instead "ultimately owed the State an additional $255,542.82 in sales and use tax," there was no amount "recovered" by Tax Matrix. Def.'s Mot. Summ. J. at 18.

In sum, certain words in the "shall mean" clause support the contention that "refunds" are to be broadly interpreted to include a variety of types of reductions in tax liability that might be achieved by Tax Matrix--including the reductions achieved during the Maryland audit--while other words suggest a narrower reading. The Court therefore finds that the "shall mean" clause has no plain meaning.

b.      The "Shall Include" Clause in the Definition of "Refund(s)"

Next, the Court turns to the "shall include" clause in the Letter Agreement's definition section for the term

---

[4]      In further support of its argument that Tax Matrix was entitled to a contingency fee only when Wegmans gets a tax return check from a state, Tax Matrix points to the definition of the term "refund," which is defined as "[t]he return of money to a person who overpaid, such as a taxpayer who overestimated tax liability . . . ." Def.'s Mot. Summ. J. at 18 n.1 (citing Black's Law Dictionary 1306 (8th ed. 2004)).

"Refund(s)," which provides that "Refund(s) . . . shall include Refund(s)[5] and/or reductions of sales and use taxes paid, assessment reductions, interest (or imputed interest, if applicable), and amounts which are credited against another tax liability of the Client." Pl.'s Mot. Summ. J. Ex. 1. In statutes, contracts, and other writings, "'include' is frequently, if not generally, used as a word of extension and enlargement rather than as one of limitation or enumeration." Am. Sur. Co. of N.Y. v. Morotta, 287 U.S. 513, 517 (1933). Thus, in most instances, the term "'shall include' . . . cannot reasonably be read to be the equivalent of 'shall mean' or 'shall include only.'" Id. Based on this general rule of contract interpretation, the list included after the words "shall include" may be read as illustrative rather than exhaustive or definitive.

However, the parties devote a number of pages in their briefs to whether the reductions achieved by Tax Matrix constitute "assessment reductions" and "reductions of sales and use taxes paid." The parties' focus on these terms suggests that they may have intended the list to be definitional, such that

---

[5]     The Court notes that the Letter Agreement's use of the words "Refund(s)" to define the capitalized term "Refund(s)" (i.e., using the term to define itself) is another example of poor drafting which has caused the Letter Agreement's susceptibility to multiple reasonable interpretations.

Tax Matrix must show that its work can be fairly characterized as an "assessment reduction" or "reduction in sales and use taxes paid" to recover its contingency fee. Accordingly, the Court finds that the "shall include" provision also creates ambiguity as to the meaning of "refunds."

Tax Matrix argues that the reductions realized by Tax Matrix while the Maryland audit remained open qualify as both "reductions of sales and use taxes paid" and "assessment reductions." Accordingly, the Court next considers whether the meaning of these terms is plain.

> i. Meaning of the Term "Sales and Use Taxes Paid"

Tax Matrix argues that the reductions realized by Tax Matrix in connection with the Maryland audit qualify as "reductions of sales and use taxes paid," because "[t]here can be no genuine dispute of material fact that, over the course of its lengthy involvement on the Maryland audit, Tax Matrix achieved significant reductions of the sales and use tax Wegmans ultimately paid to the State." Pl.'s Mot. Summ. J. 30-31. Conversely, Wegmans argues that Tax Matrix did not obtain "reductions of sales and use taxes paid," because Wegmans never paid the $4.6 million assessment from the December 12 workpapers. Def.'s Opp. to Pl.'s Mot. Summ. J. 10-11.

38

Tax Matrix's argument would require the Court to change the tense of the verb at issue from "paid" to "to be paid," which the Court cannot do. See, e.g., Bowersox Truck Sales & Serv. v. Harco Nat'l Ins. Co., 209 F.3d 273, 279-80 (3d Cir. 2000) (refusing to "reword the release and insert the future tense that is now absent," where "[o]nly the present tense appears in the relevant portions of the release"); Brown v. Am. Home Prods. Corp., No. 99-20593, 2004 U.S. Dist. LEXIS, at *16 (E.D. Pa. Jan. 7, 2004) (refusing to change the present tense of a verb to the past or perfect sense, because "[t]he words of the contract must be given their plain meaning"). Tax Matrix's reductive work on the Maryland audit cannot fairly be characterized as "reductions of sales and use taxes paid," because, as Wegmans argues, the audit by the State of Maryland determined that Wegmans underpaid its taxes and therefore Wegmans owed the State additional money. Wegmans had not yet paid the sales and use tax deficiency which was at issue during the audit.

ii.   Meaning of the Term "Assessment Reductions"

The Court also considers the plain meaning of the term "assessment reductions." Tax Matrix does not argue that the plain meaning of "assessment reductions" is clear from the Letter Agreement itself. Instead, it argues that the Court

39

should look to the parties' use of the term "assessment" in the ordinary course of business during the Maryland audit. Pl.'s Mot. Summ. J. 29. It argues that "both Tax Matrix and Wegmans routinely used the word 'assessment' to describe any and all items from which the State of Maryland was claiming a sales or use tax deficiency during the audit, regardless of whether such items were crystalized in a formal 'notice of assessment' that issues only after an audit closing meeting occurs." Id. It contends the parties would have used such terms as "final assessment," "formal assessment," or "notice of assessment" had they intended to reference this latter type of assessment. Id.

The Court finds that the plain meaning of the term "assessment reduction" in the Letter Agreement is ambiguous in that it is unclear whether it includes interim assessments issued by a state during the course of an ongoing audit or refers to only final assessments issued after a state closes its audit. The Court therefore turns to the "alternative meanings offered by counsel," to see if it aids in resolving this ambiguity. St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991) ("In determining whether a contract term is ambiguous, [the court] must consider the actual words of the agreement themselves, as well as any alternative meanings offered by counsel, and extrinsic evidence offered in support of those alternative meanings.").

40

Under Pennsylvania contract law, words and phrases as used in a particular contract are to be interpreted in accordance with the meaning with which they have been invested by the parties. Emor, Inc. v. Cyprus Mines Corp., 467 F.2d 770, 775 (3d Cir. 1972) (applying Pennsylvania law). When, at the time of formation, the parties attach the same meaning to the contract term and each party is aware of the other's intended meaning, or has reason to be so aware, the contract is enforceable in accordance with that meaning. Id. Any ambiguity in the contract, however, will be construed against the drafter. Cent. Transp. v. Bd. of Assessment Appeals of Cambria Cty., 417 A. 2d 144, 149 (Pa. 1980).

In communications made in ordinary course of business, both Wegmans and Tax Matrix representatives used the term "assessment" to describe the sales and tax use deficiencies claimed by the State of Maryland at various points in time during the audit before the State issued its final notice of assessment, including to describe the deficiency noted in the December 2012 workpapers. Because Tax Matrix drafted the Letter Agreement at issue, the Court need only determine the meaning that Wegmans attached to the term "assessment."

Here, there is ample evidence that Wegmans employees used the term "assessment" to refer to deficiencies documented in the early sets of workpapers issued by the State of Maryland.

41

Many of these communications are excerpted in the factual history above. For example, Ms. Phelps referred to the then-claimed tax deficiency as an "assessment" in a March 2013 email sent to another Wegmans employee. Pl.'s Mot. Summ. J. Ex. 46. Similarly, in a March 2013 email to Mr. Vicks, Ms. Phelps advised that that the notice of deficiency in the third workpapers constituted the "final assessment for Maryland." <u>Id.</u> at Ex. 20. And in a June 2013 email to other Wegmans executives, Ms. Phelps reported that the State of Maryland was "initially . . . proposing a $4.6 million assessment." <u>Id.</u> at Ex. 33. Mr. Vicks also remarked in an internal memorandum that "[t]he proposed audit tax liability was reduced from an initial proposed assessment of $4.6 million down to $256,000." <u>Id.</u> at Ex. 33.

On the other hand, Wegmans argues that the "assessment reductions" contemplated in the Letter Agreement are limited to reductions from final assessments issued at the close of an audit, such as the Notice of Assessment issued by the State of Maryland in July 2013. It says that this limited definition is supported by "a general understanding in the sale and use tax field as to what the term 'assessment' means." Def.'s Mot. Summ. J. 13. To buttress this argument, Wegmans points to the following disclaimer on the face of December 12 workpapers: "The deficiency listed above <u>does not represent a formal assessment</u>.

42

A formal assessment notice accompanied by appeal rights will be mailed to the Taxpayers." Id. at 12. Wegmans also highlights deposition testimony from the State's lead auditor, Ms. Pappas, as well as her supervisor, Ms. Douglas, that the December 12 workpapers were not an assessment. See Pappas Tr. at 57:10-57:13 ("Q: If you look at P-106 and P-107 . . . [a]re these two documents an assessment? A: No."); Douglas Tr. at 46:20-47:3 ("Q: If you look at Exhibit P-106, it's an email dated December 12, 2012, with the attached set of work papers. Do you see that? A: Yes. Q: Is this an assessment? A: No. This is not an assessment, no."). And Wegmans points to testimony from Ms. Douglas that "[her] understanding of an assessment is something issued by our office, normally through our audit review desk, which includes tax penalty and interest, if necessary." Douglas Tr. at 47:4-12. Thus, Wegmans argues that because none of the workpapers issued by the State of Maryland, including the December 12 workpapers, included a tax penalty or interest, they therefore cannot constitute an assessment.[6] Def.'s Mot. Summ. J. 13.

---

[6] Wegmans extensively relies on a case from the District of New Jersey, Big M, Inc. v. Dryden Advisory Group, 2009 WL 1905106 (D.N.J. 2009), to support its narrower reading of "assessment reductions." The Court notes preliminary that Big M was decided under New Jersey law, and Wegmans has not suggested that Pennsylvania law would require the same result. Moreover, the facts of Big M are substantially different from the instant case, because Big M involved two competing written contracts,

Under Pennsylvania law, "[i]t is fundamental that '[t]echnical terms and words of art are [to be] given their technical meaning unless the context or a usage which is applicable indicates a different meaning.'" <u>Fischer & Porter Co. v. Porter</u>, 72 A.2d 98, 101 (Pa. 1950) (quoting Restatement (First) of Contracts § 235(b) (Am. Law Inst. 1932)). "And this rule is especially applicable where the words of art used are legal terms." <u>Id.</u>

The term "assessment" does have a technical meaning, at least under Maryland's tax laws, and that technical meaning may be commonly used by both public- and private-sector professionals who deal in the collection of sales and use taxes. The December 12 workpapers would not qualify as an "assessment" when the term is used in the technical sense. Because the parties who negotiated the Letter Agreement were tax professionals, it is certainly possible that they intended the narrower, technical meaning.

In the face of two reasonable interpretations of the term "assessment"--the technical meaning of "assessments," such as that term is used under Maryland tax law, or the casual

---

one entered in 2004 and the other in 2007, whereas there is only one written agreement in the instant case. Further, the State of Maryland issued a final assessment that could be used to measure the contingency fee in this case, whereas no such final assessment was issued during the relevant time period in <u>Big M</u>.

44

meaning for the term, which would capture proposed deficiencies issued during an ongoing audit--the Court cannot conclude that the language of the Letter Agreement's contingency fee provision is unambiguous.

### 2.   Extrinsic Evidence

Faced with two reasonable interpretations of the Letter Agreement's language, the Court next turns to the "extrinsic evidence offered in support of th[e parties'] alternative meanings." St. Paul Fire & Marine Ins. Co., 935 F.2d at 1431. Both parties invite the Court to consider extrinsic evidence at this juncture, particularly the parties' past practices inter se after entering the Letter Agreement and course of conduct during the Maryland audit. A court may look to the course of the parties' performance when interpreting the contract to determine whether it is ambiguous. Prudential Ins. Co. of Am. v. Prusky, 413 F. Supp. 2d 489, 493-94 (E.D. Pa. 2005) (applying Pennsylvania law); see also Old Summit Mfg., 523 F.3d at 137 ("[A] court always may consider the course of performance as evidence of the intent of the parties." (citing Atl. Richfield Co. v. Razumic, 390 A.2d 736, 741 n.6 (Pa. 1978)). The actual performance of the parties under a contract tends to "make definite that which was previously unclear."

Greene v. Oliver Realty, 526 A.2d 1192, 1194 (Pa. Super. Ct.
1987).

       Tax Matrix contends that "Wegmans' interpretation
would require this Court to ignore the reality of what Tax
Matrix was hired to do: Wegmans hired Tax Matrix at the
beginning of the audit to minimize the taxes it would be
required to pay to the State of Maryland." Pl.'s Mot. Summ. J.
34. Tax Matrix thus claims that if the Letter Agreement does not
apply to such services, Wegmans "gets to reap the benefits of
Tax Matrix's services without paying for them--tantamount to
theft of services--merely because the reductions in liability
are achieved while the audit remains open." Id.

       Wegmans, on the other hand, states that it "does not
dispute that it asked Tax Matrix to assist with the Maryland
audit, or that Tax Matrix, in fact, did work in connection with
the audit" and that it "has always taken the position that Tax
Matrix should be compensated for that work." Def.'s Opp. to
Pl.'s Mot. Summ. J. 13. However, it says that "because the
Letter Agreement does not apply to pre-assessment 'reductions'
from preliminary work papers, Tax Matrix is not entitled to the
25% contingency fee" but rather "a reasonable hourly rate for
the work it performed on the Maryland audit." Id. Said
differently, "the fact that Wegmans asked Tax Matrix to assist

46

with the Maryland audit does not mean that the Letter Agreement applies." Id.

Notably, the summary judgment record does not include parol evidence--evidence of oral or written negotiations or other communications between the parties prior to entering the Letter Agreement--concerning the scope of work covered by the Agreement. See Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436-37 (Pa. 2004) ("[Evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract . . . may be introduced to explain . . . the terms of the contract."). The parties instead ask the Court to consider extrinsic evidence concerning Wegmans' decision to engage Tax Matrix in connection with the Maryland audit. The evidence available, however, is not particularly enlightening as to the meaning of terms in the Letter Agreement itself.

The summary judgment record shows that Mr. Henderson--Tax Matrix's primary contact at Wegmans who negotiated the Letter Agreement on Wegmans' behalf and asked Tax Matrix to work on the Maryland audit--believed he was engaging Tax Matrix for the Maryland audit under some sort of preexisting agreement between the parties. He testified that there was no separate engagement agreement for the Maryland audit, because Tax Matrix was already "hired to do this kind of thing" by Wegmans, and the two parties had "an ongoing relationship" with respect to "sales

47

tax and states." Id. at 37:10-18; see also id. 37:19-22.
However, the summary judgment record does not show whether the
preexisting agreement referenced by Mr. Henderson is the Letter
Agreement or some other implicit agreement that the parties had
not reduced to writing. Because the parties did not have any
sort of discussion concerning Tax Matrix's payment, or the
governing contract, at the outset of the Maryland audit, the
parol evidence does not add clarity as to the contemporaneous
understanding of the parties.

Tax Matrix highlights that Wegmans did not take the
position that the Letter Agreement did not apply to Tax Matrix's
services on the Maryland audit until after receiving Tax
Matrix's invoice. And even after Ms. Phelps initiated
discussions of alternative fee arrangements with Tax Matrix, she
suggested that workpapers issued later, such as the March 15,
2013 workpapers, could be an appropriate starting point for
calculating the contingency fee. Pl.'s Mot. Summ. J. Ex. 41.
According to Tax Matrix, this behavior suggests that Wegmans did
not have a problem with the application of the Letter
Agreement's contingency fee to Tax Matrix's services, but rather
to the amount of Tax Matrix's invoice. But Tax Matrix also
internally questioned whether the Letter Agreement, by its plain
language, applied to its work on the Maryland audit. In a
January 6, 2013 email, Mr. Frownfelter disclosed that he saw "a

potential problem with our contract wording, because with the Wegmans MD audit, we technically are not reducing an actual assessment per our contract . . . just preliminary findings." Knapp Dec. Ex. M. (ellipsis in original). Accordingly, one party's failure to raise concerns about application of the Letter Agreement before Tax Matrix issued its invoice is not dispositive.

Tax Matrix has established that Wegmans engaged Tax Matrix shortly after learning it was being audited by the State of Maryland. Moreover, as Wegmans points out in its motion for summary judgment, both Mr. Henderson and Ms. Phelps acknowledged at their depositions that the substance of the reductive work Tax Matrix performed in connection with Maryland audit was the same type of work that it would have performed had Wegmans waited until after the audit formally closed to contest the deficiency alleged by the State. Henderson Dep. at 129:7-130:6. Said differently, Wegmans could have elected to close the audit by signing the "Acknowledgement of Audit Closing Meeting" on any of the earlier workpapers and then waited for the formal Notice of Assessment to issue before asking Tax Matrix to perform additional reductive work. The nature of Tax Matrix's work would not change. At Wegmans' request, Tax Matrix was simply working proactively, rather than reactively, to reduce Wegmans' purported tax deficiencies.

But these facts alone are not enough to establish that the parties agreed that this work fell within the scope of the Letter Agreement. Although it may be unusual for two sophisticated commercial entities--who had historically reduced their engagement agreement to writing--to do business together for a significant period of time without ever discussing how one of those parties would be compensated for its services, much less reducing their agreement to writing, Wegmans has raised a genuine dispute of material fact as to whether that happened here.

Although Wegmans has paid Tax Matrix a twenty-five percent contingency fee in connection with all of the sales and use tax audit defense services for which it has invoiced Wegmans to date, the parties dispute the factual circumstances of those audits and the nature of the reductive work that Tax Matrix performed. It is less than pellucid from the summary judgment record whether the work performed on those other audits is comparable to the work performed on the Maryland audit. The parties' course of performance is therefore not particularly enlightening as to whether the parties intended for the Letter Agreement to govern all of Tax Matrix's services on behalf of Wegmans under all circumstances, regardless of when in the audit or appeal process Wegmans chose to engage Tax Matrix or what types of reductions Tax Matrix ultimately achieved.

50

For the reasons discussed above, the Court cannot find that the Letter Agreement's terms are unambiguous or that there is only one reasonable way to read the Letter Agreement as it relates to Tax Matrix's work on the Maryland audit. Accordingly, the Court will deny Tax Matrix's summary judgment motion on this issue.

B.   Wegmans' Motion for Summary Judgment as to Tax Matrix's Breach of Contract Claim

The Court turns next to Wegmans' cross-motion for summary judgment on Tax Matrix's breach of contract claim. Wegmans argues that the Letter Agreement's "clear and unambiguous language" demonstrates that "it was never intended to apply to pre-assessment audit defense work, such as the work Tax Matrix performed on the Maryland audit." Def.'s Mot. Summ. J. at 1. In essence, Wegmans does not dispute the validity of the Letter Agreement but claims just the opposite of Tax Matrix--that the work performed by Tax Matrix on the Maryland audit does not fall within the scope of that agreement. Wegmans also asks this Court to consider extrinsic evidence and presents several arguments for why its interpretation of the Letter Agreement is the only reasonable one.

Because Wegmans raises the same arguments in its cross-motion as it does in opposing Tax Matrix's summary judgment motion, the Court incorporates much of the discussion

above here. However, because a court presented with cross-
motions for summary judgment must decide each motion on an
"individual and separate basis, <u>Schlegel</u>, 269 F. Supp. 2d 612,
615 n.1, the Court will address Wegmans' chief arguments
separately below.

First, Wegmans contends that "the Letter Agreement
provides that Tax Matrix . . . is entitled to a contingency fee
[only] for 'refunds,' which are defined as 'amounts <u>recovered</u>
through the refund claim process,' including 'reductions of
sales and use taxes <u>paid</u>' and 'assessment reductions'" and that
Tax Matrix did not "recover" anything or achieve "reductions"
since "Wegmans ultimately owed money to the State." <u>Id.</u>
(emphasis in original). This view is too narrow. For one thing,
this reading would not cover any reductions obtained by Tax
Matrix after appealing a finding that Wegmans owed additional
taxes to the state, in which Tax Matrix convinces the state to
reduce an assessment, maybe even to zero, but does not
ultimately achieve a tax refund check for Wegmans. In such
cases--unless Wegmans elected to pay an assessment under protest
to avoid incurring additional interest charges during the appeal
process--no money would be returned to Wegmans by the state.
Moreover, this reading would be inconsistent with language that
appears later in the definition of "refunds" stating that
refunds "shall include . . . imputed interest, if applicable," a

term relevant only in situations where the taxpayer has not yet paid an assessment. Pl.'s Mot. Summ. J. Ex. 1.

Second, Wegmans argues that the first workpapers were not an assessment, because "the primary auditor in charge of the Maryland [a]udit, as well as her supervisors, testified that the December 12 Work Papers were not an 'assessment.'" Def.'s Mot. Summ. J. at 1. As discussed above, the summary judgment record fails to clarify whether the parties' use of the term "assessment" in the Letter Agreement applies only to final, appealable notices of assessment issued by a state upon close of an audit or whether the parties also intended to include interim assessments issued during the course of an ongoing audit. The testimony of the Maryland auditors as to what qualifies as an "assessment" under Maryland sales and use tax law is not dispositive, because the Letter Agreement was intended to govern--and has since actually governed--Tax Matrix's services for Wegmans in connection with tax collection by several states, not just the State of Maryland. Moreover, as discussed above, the summary judgment record shows that Wegmans employees referred to the deficiencies enumerated in the various sets of workpapers as "assessments."

Third, other evidence could suggest that Wegmans believed that Tax Matrix's work on the Maryland audit fell within the scope of the Letter Agreement at the time it engaged

53

Tax Matrix for the Maryland audit. For instance, after reviewing
the letter that Tax Matrix sent to Mr. Wegman, in which Tax
Matrix contends that its services on the Maryland audit were
pursuant to the Letter Agreement and it therefore earned the
contingency fee for which it billed Wegmans, Pl.'s Mot. Summ. J.
Ex. 43, Mr. Henderson--who both negotiated the Letter Agreement
on behalf of Wegmans and made the decision to engage Tax Matrix
at the outset of the Maryland audit--said that the letter "spoke
the truth." Id. at Ex. 44. In addition, Wegmans did not take the
position that the Letter Agreement did not apply to Tax Matrix's
services during the Maryland audit until after receiving Tax
Matrix's invoice. And even after Ms. Phelps initiated
discussions of alternative fee arrangements with Tax Matrix, she
suggested that workpapers issued later, such as the March 15,
2013 workpapers, could be an appropriate starting point for
calculating the contingency fee. Pl.'s Mot. Summ. J. at Ex. 41.
Such evidence raises a factual dispute as to whether Wegmans
contests application of the Letter Agreement's contingency fee
to Tax Matrix's services or instead is displeased with the
amount of Tax Matrix's invoice.

        Finally, Wegmans makes much of the purported
"admission" by Tax Matrix that the Letter Agreement did not
cover reductions achieved by Tax Matrix prior to a state's
issuance of the formal notice of assessment. It points to a

January 6, 2013 email from Mr. Frownfelter, Tax Matrix's Tax

Director, to Mr. Espenshade, Tax Matrix's President, which

states as follows:

> See the attached Wegmans contract. It references
> refunds and assessment reduction. I see a potential
> problem with our contract wording (not necessarily
> with Wegmans, but overall). For example, with the
> Wegmans MD audit, we technically are not reducing an
> actual assessment per our contract . . . just
> preliminary findings. Thoughts?

Knapp Dec. Ex. M. (ellipsis in original). Thereafter, Tax Matrix

amended its standard agreement to read as follows: "Refunds

shall include but not be limited to, tax refunds, tax benefits,

tax credits and/or reductions to current tax payments, tax

liability, preliminary audit assessments, or audit assessments,

including interest (or imputed interest, if applicable) and/or

penalty (herein collectively 'Refund(s)')." Knapp Dec. Ex. N.

Based on Tax Matrix's actions, Wegmans argues that "Tax Matrix's

position in this litigation--that the "reductions" it claims to

have made to the December 12 Work Papers constitute 'refunds'

under the Letter Agreement--directly contradicts its own

internal interpretation of the Letter Agreement while the

Maryland Audit was ongoing and is refuted by the fact that Tax

Matrix rewrote its Letter Agreement to include 'preliminary

audit assessments.'" Def.'s Mot. Summ. J. 21.

Wegmans contends that Tax Matrix's conduct is an

admission fatal to Tax Matrix's case. The Court disagrees. Tax

Matrix's decision to amend its standard form agreement is not necessarily an admission on its part that the Letter Agreement did not cover its services in connection with the Maryland audit. It says nothing about whether the parties believed that the Letter Agreement covered Tax Matrix's services on the Maryland audit at the time that Wegmans engaged Tax Matrix to defend it during the audit. Tax Matrix could plausibly believe that the Letter Agreement extended to its services on the Maryland audit based on its communications or prior course of dealings with Wegmans, while still seeing a need to clarify its agreements with other clients for future cases.

When analyzing whether the work performed by Tax Matrix in this case falls within the scope of the Letter Agreement, the Court is concerned exclusively with the meaning that the parties attached to the terms of the agreement at the time of formation. Emor, Inc., 467 F.2d at 775. That a party may later have second thoughts about the drafting of a contract, or that it may conclude that the contract should be modified to avoid future disputes, does shed light (i.e., it is not parol evidence) of the parties' intent at the time the contract was entered.[7]

_____

[7]    While the parties argue at length about whether evidence in connection with Tax Matrix's decision to amend its standard contract would be excluded as a subsequent remedial measure under Rule 407 of the Federal Rules of Evidence, the

Under these circumstances, there is a genuine dispute of material fact as to whether the parties intended the Letter Agreement to extend to Tax Matrix's work on the Maryland audit. Therefore, the Court will also deny Wegmans' motion for summary judgment on this issue.

## V.   WEGMANS' FIRST AND SECOND COUNTERCLAIMS CONCERNING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AND BREACH OF FIDUCIARY DUTY

Tax Matrix also moves for summary judgment on Wegmans' first and second counterclaims regarding breach of the implied

---

parties' focus on this issue is misguided. Under Rule 407, "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of subsequent [remedial] measures is not admissible to prove . . . culpable conduct," although "the court may admit this evidence for another purpose." Fed. R. Evid. 407. The Third Circuit has applied Rule 407 in breach of contract actions, where "admitting the [contract] revisions would discourage those in [the party's] situation from clarifying contractual obligations and thus would perpetuate confusion." Reynolds v. Univ. of Pa., 483 F. App'x 726, 731-33 (3d Cir. 2012) (nonprecedential). However, the Advisory Committee's note to Rule 407 make clear that "the rule applies only to changes made after the occurrence that produced the damages giving rise to the action," and "[e]vidence of measures taken by [a party] prior to the 'event' causing 'injury or harm' do not fall within the exclusionary scope of Rule 407." Fed. R. Evid. 407 advisory committee's note to 1997 amendments. Here, revision of the agreement was not a subsequent remedial measure, because the alleged incident giving rise to this action--Wegmans' failure to pay the invoice, or at the earliest, issuance of the invoice by Tax Matrix--had not yet happened at the time Tax Matrix revised its standard agreement. Therefore, Rule 407 is not the appropriate yardstick to measure the admissibility of this evidence. Instead, the threshold question is whether evidence of Tax Matrix's revised agreement is relevant to determining the parties' intent at the time the Letter Agreement was executed. See Fed. R. Evid. 401, 402.

covenant of good faith and fair dealing and breach of fiduciary duty, respectively. Wegmans opposes Tax Matrix's motion for summary judgment on these claims but does not bring its own cross-motion for summary judgment.

In its motion for summary judgment, Tax Matrix argues that the basis for these two counterclaims is "Tax Matrix's supposed 'dishonest and misleading conduct' in seeking to be paid its fees under the Letter Agreement, i.e., filing the instant lawsuit and taking the position that the $4.6 million figure from the First Workpapers should be the 'starting part' for calculation of the contingent fee." Pl.'s Mot. Summ. J. 40. Further, its alleged damages "consist[] solely of its attorneys['] fees in defending this litigation." Id. Tax Matrix claims that these counterclaims are "really just thinly disguised requests for attorneys' fees, which have no basis in law." Id. It claims that under the American Rule, each party is responsible for paying its own fees in litigation, and "[a] plaintiff's position in litigation is not grounds for a counterclaim for attorneys' fees simply [because] the defendant disagrees with it." Id.

In its response to Tax Matrix's motion for summary judgment, Wegmans claims that the American rule applies "only when the prevailing party seeks to recover attorneys' fees incurred in prosecuting its claims in addition to recovering its

58

damages," but that such fees are recoverable "when they are the
appropriate measure of a party's damages." Def.'s Opp. to Pl.'s
Mot. Summ. J. 26. It then expounds on a course of conduct by Tax
Matrix which it claims was aimed at misleading Wegmans'
employees into believing that the Letter Agreement applied and
thus shows that the award of attorney's fees to Wegmans is
appropriate. Id. at 27-34. While Defendant devotes a number of
pages to describing this allegedly deceptive conduct, it aptly
summarizes its factual contentions in support of its
counterclaims as follows:

> Among other things, Tax Matrix has produced
> documents demonstrating that it: (1) knew that
> the Letter Agreement did not apply to the work it
> performed on the Maryland audit, yet nonetheless
> decided to bill Wegmans for the 25% contingency
> fee under the Letter Agreement; (2) sent Wegmans'
> Laurie Phelps a series of misleading e-mails--
> knowing full well that Phelps was not involved
> with the Maryland audit prior to January 2013 and
> had no prior sales and use tax experience before
> that time--in an attempt to "create a record" to
> get Wegmans to pay the contingency fee; (3)
> maintained its "position" that the Letter
> Agreement applied even after Wegmans refused to
> pay the contingency fee, sending additional
> misleading e-mails and letters to Wegmans in an
> attempt to get Wegmans to pay; (4)
> surreptitiously reached out to Wegmans' former
> employee Chuck Henderson, in an attempt to get
> him to support Tax Matrix's "position"; (5) filed
> this lawsuit, alleging the Wegmans breached the
> Letter Agreement, despite not believing that the
> Letter Agreement applied to the Maryland audit
> work; and (6) continued to attempt to influence
> Henderson to support its position, even after the
> litigation was filed and Tax Matrix knew that he
> was represented by Wegmans' counsel.

Id. at 27-28.

Although the parties blend their discussions of Wegmans' first and second counterclaims in their briefs and focus on whether an award of attorneys' fees is proper, the Court will discuss liability for each counterclaim separately.

A.   Wegmans' First Counterclaim Concerning Tax Matrix's Breach of the Implied Covenant of Good Faith and Fair Dealing

Under Pennsylvania law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Bethlehem Steel Corp. v. Litton Indus., 488 A.2d 581, 600 (Pa. 1985). The duty of "good faith" has been defined as "[h]onesty in fact in the conduct or transaction concerned." 13 Pa. Con. Stat. Ann. § 1201; Kaplan v. Cablevision of Pa., Inc., 671 A.2d 716, 722 (Pa. Super. Ct. 1996). While breach of the obligation to act in good faith cannot be precisely defined in all circumstances, examples of "bad faith" conduct include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super Ct. 1992) (citing Restatement (Second) of Contracts § 205(d) (Am. Law Inst. 1981)). Here, however, Wegmans has not pointed to

60

a contract (it denies that the Letter Agreement applies) containing such a duty or provided authority suggesting that the duty of good faith and fair dealing would extend to a party's efforts to collect a debt believed to be due under a contract.

First, throughout this litigation, Wegmans has alleged that the Letter Agreement does not govern Tax Matrix's work on the Maryland audit. Accordingly, any duty of good faith and fair dealing associated with the Letter Agreement would be inapplicable to Tax Matrix's conduct here. In other words, a party cannot disclaim the applicability of a written contract and, at the same time, claim the other party has breached a duty of good faith and fair dealing under that same contract.

Second, even assuming that Wegmans is correct and that there was some sort of implicit agreement between the parties concerning Tax Matrix's services on the Maryland audit, and that consequently an implied duty of good faith and fair dealing attached, such a duty would apply only to Tax Matrix's "performance" under the agreement, Bethlehem Steel Corp., 488 A.2d at 600, and not to its conduct in seeking to collect payment from Wegmans.

And, third, to the extent that Wegmans alleges that there was no agreement at all between the parties (not the Letter Agreement or some other implied agreement) that governed Tax Matrix's work on the Maryland audit and the unjust

enrichment doctrine applies in this case, the implied duty of good faith and fair dealing is inapplicable to unjust enrichment claims.

For these reasons, the Wegmans' first counterclaim fails as a matter of law, and the Court will grant summary judgment in favor of Tax Matrix on this counterclaim.

B.    Wegmans' Second Counterclaim Concerning Tax Matrix's Breach of Fiduciary Duty

Similarly, Wegmans' attempt to shoehorn Tax Matrix's debt collection efforts into a breach of fiduciary duty also fails. As Wegmans correctly notes in its brief in opposition to Tax Matrix's motion for summary judgment, Def.'s Opp. to Pl.'s Mot. Summ. J. 26, "[a]n agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit." Basile v. H & R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000)). "Thus, in all matters affecting the subject of the agency, the agent must act with the utmost good faith in furthering and advancing the principal's interests, including a duty to disclose to the principal all relevant information." Id. As Wegmans admits, "[t]here is no dispute that Tax Matrix owed fiduciary duties to Wegmans as its agent and representative, pursuant to a power of attorney, in connection with the Maryland audit." Def.'s Opp. to Pl.'s Mot. Summ. J. 26 n.16 (emphasis added). In other words, Tax Matrix was Wegmans'

62

agent in dealing with the Maryland audit only. However, Tax
Matrix's purported bad faith conduct does not concern the
"subject of the agency," i.e., Tax Matrix's services as a
consultant to Wegmans on the Maryland audit, but rather concerns
Tax Matrix's efforts to collect on a debt that Tax Matrix
believes it is owed. Accordingly, there is no fiduciary duty
applicable here, since Tax Matrix's conduct occurred outside of
the "subject of the agency." Basile, 761 A.2d at 1120.

     The Court has reviewed and considered the five cases
cited by Wegmans in support of its first and second
counterclaims: Ames v. Westinghouse Elec. Corp., 864 F.2d 289
(3d Cir. 1988); Riveredge Assocs. v. Metro. Life Ins. Co., 774
F. Supp. 897 (D.N.J. 1991); Bygott v. Leaseway Transp. Corp.,
637 F. Supp. 1433 (E.D. Pa. 1986); Chuy v. Nat'l Football League
Players' Ass'n, 495 F. Supp. 137 (E.D. Pa. 1980); and Basile v.
H & R Block, Inc., 761 A.2d 1115 (Pa. 2000). These cases are
inapplicable to the facts in this case.

     Ames, 864 F.2d 289, Chuy, 495 F. Supp. 137, and
Bygott, 637 F. Supp. 1433, concern whether a defendant-union had
a duty to represent one or more plaintiff-employees in legal
proceedings under federal law, specifically the Labor Management
Relations Act. Certainly, the instant case does not arise under
the specific circumstances in which Labor Management Relations

Act applies nor does it involve an employee or union. Therefore, these cases are not apposite.

The fourth case cited by Wegmans, Riveredge Associates, was decided under New Jersey law. 774 F. Supp. at 900 (noting that "[u]nder New Jersey law, a legal position asserted in bad faith may constitute a breach of contract even when that legal position, far from being frivolous, is actually supported by the express language of the contract"). At the motion to dismiss stage, the parties agreed that Wegmans' counterclaims are governed by Pennsylvania law, see supra note 2, and Wegmans fails to show that Pennsylvania courts would adopt New Jersey's understanding of the applicability of a fiduciary duty to the facts of this case.

And finally, in the fifth case, Basile v. H & R Block, Inc., the Pennsylvania Supreme Court determined that H & R Block, a company that provides tax preparation services nationwide through a network of thousands of retail offices, was not an agent for customers who used its services. 761 A.2d at 1121. It therefore had no fiduciary duty to disclose that it shared the fee in connection with tax refund anticipation loans it secured from a bank on behalf of its customers as part of its Rapid Refund program. Id. Because the Basile court found that no agency relationship existed between the tax preparation company

64

and its customers, that case also cannot support Wegmans' breach of fiduciary duty claim here.

For the reasons discussed above, Wegmans' second counterclaim fails as a matter of law, and the Court will grant Tax Matrix's motion for summary judgment as to this counterclaim.[8]

---

[8]     In their briefs, the parties focus on whether Wegmans' measure of damages as to its first and second counterclaims--its attorneys' fees in the current case--are barred by the American Rule. Having found that Wegmans has not advanced a theory of liability here, the Court need not address the damages issue. However, for the sake of completeness and because the parties have allotted much time to arguing this issue, the Court will briefly address damages below.

The American Rule, as applicable under Pennsylvania law, provides that a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception. Trizechahn Gateway LLC v. Titus, 976 A.2d 474, 482-83 (Pa. 2009). In its opposition to Tax Matrix's motion for summary judgment, Wegmans does not expressly identify the "established exception" to the American Rule under which it brings these counterclaims. Indeed, it does not advance separate arguments in support of its claim for breach of the implied covenant of good faith and fair dealing (first counterclaim) and breach of fiduciary duty (second counterclaim), instead lumping its argument in support of these two counterclaims together. Wegmans cites four cases discussed above and one additional statute in support of its argument that an exception to the American Rule applies in this case.

As explained more fully above, the cases cited by Wegmans in support of its claim for attorneys' fees--Ames, Riveredge Associates, Bygott, and Chuy--are inapplicable to the facts of this case, because they were decided under either federal or New Jersey law.

Wegmans also cites a Pennsylvania statute, 42 Pa. Cons. Stat. § 2503, which provides that attorneys' fees may be awarded by the court where the commencement of an action is "arbitrary, vexatious or in bad faith," or where a party's conduct during an action is "dilatory, obdurate or vexatious." 42 Pa. Cons. Stat. § 2503(7), (9). A party acts vexatiously "if he filed the suit without sufficient grounds in either law or in fact and if the suit served the sole purpose of causing annoyance." Thunberg v. Strause, 682 A.2d 295, 299 (1996). "Bad faith" conduct is motivated by "fraud, dishonesty, or corruption." Id. at 299–300. Mere disapproval or disfavor of the defendant's actions is insufficient to support a claim for fees. Mosaica Acad. Charter Sch. v. Dep't of Educ., 813 A.2d 813, 824-25 (Pa. 2002). Additionally, the bad faith or vexatious conduct justifying an award of attorneys' fees must pertain to the current litigation, and pre-litigation conduct is not covered by the statute. See, e.g., Cher-Rob, Inc. v. Art Monument Co., 594 A.2d 362, 364 (Pa. Super. Ct. 1991) (explaining that 42 Pa. Con. Stat. § 2503(7) permits an award of fees for bad faith conduct that occurs only after the lawsuit is initiated).

As an initial matter, it is unclear whether a federal court sitting in diversity may award attorneys' fees under § 2503 in light of its potential conflict with Rule 11 of the Federal Rules of Civil Procedure. See Hartford Acc. & Indem. Co v. First Pa. Bank, N.A., No. 86-7363, 1988 WL 11663, at *3 n.4 (E.D. Pa. Feb. 16, 1988) (recognizing but not reaching the question of "whether application of [§ 2503] would be appropriate or required under the Rules of Decision Act in light of its potential conflict with Rule 11"). But see Montgomery Ward & Co. v. Pacific Indem. Co., 557 2d 51, 55-58 (3d Cir. 1977) (noting that state statutes concerning attorneys' fees should be followed by federal courts sitting in diversity where the state statute reflects state policy judgment and application would not conflict with federal statutes or policy considerations). Pennsylvania courts "have consistently and unambiguously limited the availability of attorneys' fees under § 2503[] to matters litigated before components of the 'unified judicial system.'" Reitz v. Dieter, 840 F. Supp. 353, 355 (E.D. Pa. 1993) (collecting cases). And at least one other federal court has noted that § 2503 is a procedural rule applicable in Pennsylvania's courts and that Rule 11 addresses similar concerns, although that court's subject matter jurisdiction was grounded upon a federal question, not diversity jurisdiction. Id. (citing Erie, 304 U.S. 64).

66

## VI.  WEGMANS' THIRD COUNTERCLAIM CONCERNING TAX MATRIX'S BREACH OF CONFIDENTIALITY

Finally, Tax Matrix moves for summary judgment on Wegmans' third counterclaim for breach of the confidentiality

---

Moreover, Wegmans has not alleged bad faith or vexatious conduct on the part of Tax Matrix pertaining to the current litigation. Even though Tax Matrix's interpretation of the Letter Agreement is not the only reasonable interpretation, it is not unreasonable to read the language of the Letter Agreement as applying to Tax Matrix's work on the Maryland audit or for Tax Matrix to assume that it would be paid pursuant to the only written agreement between the parties. Accordingly, there is no basis for Wegmans' argument under § 2503, which appears to be based wholly on the alleged frivolousness of that claim. The Letter Agreement is so written that the dispute as to its terms is genuine and so Plaintiff's case is not devoid of merit. Wegmans has not alleged any other actions taken by Tax Matrix during the pendency of this litigation designed to cause delay or done in bad faith, and § 2503 does not apply to pre-litigation conduct.

The Court also notes that Wegmans' factual contentions in support of its first and second counterclaims hint at a cause of action for the tort of wrongful use of civil proceedings. Pennsylvania's well-known Dragonetti Act allows the imposition of liability on "[a] person who takes part in the procurement, initiation or continuation of civil proceedings," where

(1)   he acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and

(2)   the proceedings have terminated in favor of the person again whom they are brought.

Pa. Cons. Stat. § 8251(a). Therefore, a party bringing a Dragonetti action must show that it prevailed in the underlying action. Because the instant litigation has not yet been terminated, much less terminated in Wegmans' favor, any Dragonetti claim by Wegmans is premature.

provision of the Letter Agreement. Wegmans does not move for summary judgment on this claim in its cross-motion.

In this counterclaim, Wegmans alleges that Tax Matrix breached the confidentiality provision in the Letter Agreement when it issued a press release containing confidential information that Wegmans obtained during the Maryland audit. Counterclaim ¶ 33. It further claims that Tax Matrix breached the confidentiality provision by publicly filing the Complaint in the instant matter, which purportedly contains confidential information that Tax Matrix obtained during its work on the Maryland audit. Id. ¶ 34. As a result of Tax Matrix's actions, Wegmans claims that it suffered harm to its reputation and resulting damages.

In its motion for summary judgment, Tax Matrix argues that Wegmans has no evidence of damages it suffered in connection with these actions, so this counterclaim must fail. In fact, it states Wegmans concedes that it has suffered no damages. Mr. Vicks, during his deposition as Wegmans' Rule 30(b)(6) designee, testified that he "was not aware of any specific damages" that Wegmans suffered, "but it's quite possible that there may be some pricing impact that may have occurred within the organization." Pl.'s Mot. Summ. J. Ex. 45, Wegmans Corporate Representative Dep. at 32:16-23.

In its opposition to Tax Matrix's summary judgment motion, Wegmans fails to address the third counterclaim altogether. Moreover, this Court has reviewed the summary judgment record, and it does not include any purported press release by Tax Matrix.

Under Federal Rule of Civil Procedure 56(e), "[i]f a party . . . fails to properly address another party's assertion of fact, the court may," among other things, "consider the fact undisputed for purposes of the motion" or grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show the that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3). Accordingly, the Court will grant Tax Matrix's motion for summary judgment as to Wegmans' third counterclaim. Wegmans' third counterclaim will therefore be dismissed.

## VII. CONCLUSION

For the reasons discussed above, the Court concludes that the Letter Agreement is fairly susceptible to different reasonable interpretations as to whether it governs Tax Matrix's services in connection with the Maryland audit. Accordingly, summary judgment to Tax Matrix on Tax Matrix's breach of contract claim is denied. Likewise, summary judgment to Wegmans on Tax Matrix's breach of contract claim is also denied.

69

However, summary judgment is granted to Tax Matrix on all three of Wegmans' counterclaims.

      An appropriate order follows.